# United States Court of Appeals
## For the First Circuit

No. 06-1976

JOHNNY FRITS MEWENGKANG,

Petitioner,

v.

ALBERTO R. GONZÁLES,
Attorney General of the United States,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Circuit Judge,
Tashima,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Wei Jia, on brief for petitioner.
Sophia A. Kapsaskis, Special Assistant U.S. Attorney, and Michael J. Sullivan, United States Attorney, on brief for respondent.

May 25, 2007

---

* Of the Ninth Circuit, sitting by designation.

**TORRUELLA, <u>Circuit Judge</u>.** In this petition for review, Johnny Frits Mewengkang contests the decision of the Board of Immigration Appeals ("BIA") denying his request for withholding of removal. After careful consideration, we deny the petition for review and affirm the decision of the BIA.

## I. <u>Background</u>

Mewengkang is an Indonesian national. He entered the United States on a B1/B2 visa on June 24, 1996, but remained in the United States past the time permitted by his visa. In May 2002, Mewengkang filed an application for asylum. On March 11, 2003, Mewengkang was served with a Notice to Appear, charging him with removability. Mewengkang conceded that he was removable, but petitioned for withholding of removal on the ground that he would be subject to persecution on account of his religion if he was returned to Indonesia. Mewengkang presented his claim before an immigration judge ("IJ").

The gist of Mewengkang's claim is that he is a Christian, and that upon return to Indonesia, he would be subject to persecution by members of the predominant religion there, which is Islam. Mewengkang claims that his cousin was killed because he had organized a Christian proselytizing trip to a majority-Muslim area. Furthermore, Mewengkang claims that his general contracting business suffered because of his refusal to join a Muslim builders'

union known as the ISNI, and that he was violently harassed after he complained about its interference in the contracting process.

The IJ rendered a decision on the day of the hearing, finding that Mewengkang was not credible because (1) he initially listed one child on his asylum application when in fact he had two; (2) there were discrepancies in Mewengkang's account of the violent incident with the ISNI; (3) Mewengkang testified that he had not applied for asylum until 2002 because he was unfamiliar with the process despite familiarity with other immigration procedures; and (4) there was a discrepancy in Mewengkang's testimony about his employment in the United States.  Furthermore, the IJ found that even if Mewengkang's account of past persecution was credible, it was unlikely that he would be persecuted if he returned to Indonesia, and that Mewengkang's real motivation was economic gain.[1]

Mewengkang appealed to the BIA, which affirmed by per curiam order, stating that the inconsistencies identified by the IJ provided a reasonable basis for rejecting Mewengkang's testimony. The BIA order further held that Mewengkang had not established a clear probability that he would be persecuted upon his return to

---

[1]  The IJ also noted that Mewengkang's asylum application was time-barred under 8 U.S.C. § 1158(a)(2)(B), which provides that asylum applications must be filed within one year of the alien's arrival in the United States.

Indonesia. Therefore, the BIA ordered Mewengkang removed, but granted him sixty days to depart voluntarily.

## II. Discussion

### A. Standard of Review

The attorney general may not remove an alien whose life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). The alien bears the burden of proving that it is more likely than not that he will be persecuted. Sharari v. Gonzáles, 407 F.3d 467, 474 (1st Cir. 2005).

Where the BIA has adopted the IJ's credibility determination, as here, we review the determination of the IJ. Chen v. Gonzáles, 418 F.3d 110, 113-14 (1st Cir. 2005). The BIA has previously stated that an alien may be found incredible based on discrepancies in testimony where "(1) the discrepancies and omissions described by the Immigration Judge are actually present; (2) these discrepancies and omissions provide specific and cogent reasons to conclude that the respondent provided incredible testimony; and (3) the respondent has not provided a convincing explanation for the discrepancies and omissions." Matter of A-S-, 21 I. & N. Dec. 1106, 1109 (BIA 1998); see also Hoxha v. Gonzáles, 446 F.3d 210, 216-17 (1st Cir. 2006) (applying test from Matter of A-S-). However, "an adverse credibility determination cannot rest on trivia but must be based on discrepancies that 'involved the

-4-

heart of the asylum claim.'" Bojorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999) (citation omitted).

We then review an IJ's overall findings of fact to see if they are supported by "substantial evidence." Sharari, 407 F.3d at 473. "We afford de novo review to the BIA's legal conclusions, but cede some deference to its interpretations of the [Immigration and Nationality Act]." Da Silva v. Ashcroft, 394 F.3d 1, 5 (1st Cir. 2005).

**B. Was the IJ's credibility determination supported by substantial evidence?**

The IJ based his adverse credibility determination on four discrepancies in Mewengkang's testimony. First, Mewengkang stated on his asylum application that he only had one child, but later testified that he had two. Mewengkang's explanation for the discrepancy was that his immigration consultant, "Mr. Poppy," told him that he did not have to list married children. Mewengkang could not produce Mr. Poppy to testify. The IJ stated in his opinion that he did not find this explanation convincing given the possibility of an alternative explanation, namely, that the child not listed on the asylum application had applied and been rejected for a visa to visit the United States, and that Mewengkang thought that listing the child would hurt his chances to obtain withholding of removal. Because Mewengkang provides no evidence that would support his explanation for the discrepancy in testimony and

because we find the IJ's alternative explanation convincing, we do not disturb the IJ's conclusion.

In addition, Mewengkang stated on his asylum application that he had not been employed in the United States prior to 1997. However, Mewengkang testified before the IJ that he had been employed in a retirement home in 1996. Mewengkang provided no explanation for this discrepancy at the hearing, and does not attempt to do so now. Accordingly, we do not disturb the IJ's determination that Mewengkang had not been forthcoming on his asylum application.

Although it is unclear whether these two discrepancies go to the heart of Mewengkang's asylum claim, the IJ did not rely on them alone. The IJ identified two other discrepancies, one that directly bears on the events giving rise to Mewengkang's asylum claim, and one relating to Mewengkang's asylum application. First, Mewengkang stated in his asylum application that when he confronted the ISNI, "the outcome was worst. My complaint make the [ISNI] group become violent. They attacked me and broke my right hand." However, when testifying before the IJ, Mewengkang explained that in fact he had lost his temper and began fighting with an ISNI member, and that his hand was lacerated, not broken. Mewengkang explains this discrepancy by stating that his immigration consultant's language skills were poor, and that the confusion resulted from a mistranslation. Again, Mewengkang did not offer

evidence that his statements had been mistranslated. Furthermore, we agree with the IJ that the fact that Mewengkang's asylum application made no mention of Mewengkang's role in inciting the altercation with the ISNI seems calculated to mislead rather than the product of an innocent mistranslation. Thus, we do not disturb the IJ's finding that Mewengkang's explanation for the discrepancy was not convincing.[2]

In addition, Mewengkang testified that he did not apply for asylum immediately upon his arrival to the United States because he was not aware that such a claim could be made. Mewengkang testified that he first became aware that he could make an asylum claim in 2000. However, although Mewengkang testified that he was ignorant of the asylum procedures, he also testified that he was aware of other and availed himself of other immigration procedures, such as the visa lottery. Moreover, although Mewengkang claims to have learned about asylum in 2000, he did not

---

[2] The IJ also noted that Mewengkang had stated in his asylum application that he had made a complaint to the Indonesian government regarding discrimination, but that this was misleading because it referred not to discrimination by the ISNI, but to something having to do with an agricultural business he owned at one point. Mewengkang explains that the statements were not inconsistent, and that he made two separate complaints of discrimination. It is not clear whether this confusion resulted from an effort by Mewengkang to mislead the IJ or from the IJ's misunderstanding of Mewengkang's admittedly confusing allegations, but in either case, it is clear that the IJ listed this discrepancy as only one example of Mewengkang's lack of candor. Thus, this argument does not alter our conclusion that the IJ's credibility determination was supported by substantial evidence.

file his asylum application until two years later, in 2002. Mewengkang explained that this delay was caused by his immigration consultant, but offered no further details. We agree with the IJ that Mewengkang's explanation for these discrepancies was unconvincing, especially in light of his age and apparent sophistication. Mewengkang can point to no evidence that would support his explanation for the discrepancy, and as such, we do not disturb the IJ's conclusion.

These discrepancies in Mewengkang's testimony, including those regarding the events giving rise to his claim for withholding and regarding his application for asylum and withholding provide substantial evidence to support the IJ's credibility determination. As such, we conclude that the IJ did not err in determining that Mewengkang was not credible.

## C. Did the IJ err in determining that Mewengkang was not entitled to withholding of removal?

Mewengkang is entitled to withholding of removal only if he can show that it is more likely than not that he will be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion. Sharari, 407 F.3d at 474. The IJ determined that Mewengkang's testimony that he would be persecuted was not credible, and that his desire to remain in the United States was motivated by economic concerns. Mewengkang suggests that even if the IJ determined that his allegations of past persecution were not credible, he might still

-8-

be entitled to withholding of removal if he can show a likelihood of future persecution.  See 8 C.F.R. 208.16(b)(2) ("An applicant who has not suffered past persecution may demonstrate that his or her life or freedom would be threatened in the future in a country if he or she can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country.").  Although Mewengkang is correct in this assertion, he ultimately fails to point to any evidence in the record that suggests that he would be persecuted on account of his religion if he were returned to Indonesia; an unsupported statement alone will not support Mewengkang's burden in light of the IJ's adverse credibility finding.  In the absence of such evidence, we conclude that the IJ did not err in denying Mewengkang's claim for withholding of removal.

### III. Conclusion

For the reasons stated above, we deny the petition for review and affirm the decision of the BIA.

**Affirmed**.