# United States Court of Appeals
## For the First Circuit

No. 07-1775

CHANTHOU HEM and KHIENG HAY MOM a.k.a. KIMHENG TEK,

Petitioners,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL*

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, <u>Circuit Judge</u>,
Selya, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

<u>Joseph A. MacDonald</u> on brief for petitioners.
<u>Elizabeth A. Greczek</u>, Attorney, Office of Immigration
Litigation, <u>Peter D. Keisler</u>, Assistant Attorney General, and <u>Barry
J. Pettinato</u>, Assistant Director, on brief for respondent.

January 24, 2008

_____
    *Pursuant to Fed. R. App. P. 43(c)(2), Attorney General
Michael B. Mukasey has been substituted for former Attorney General
Alberto R. Gonzales as the respondent herein.

**LIPEZ, Circuit Judge.** Petitioners Chanthou Hem and Khieng Hay Mom, a wife and husband, are citizens of Cambodia who seek review of a decision by the Board of Immigration Appeals ("BIA") affirming denial of their application for asylum, withholding of removal and protection under the Convention Against Torture ("CAT").[1] An Immigration Judge ("IJ") found that their accounts of political persecution lacked credibility, and the BIA agreed that significant discrepancies in their stories undermined their claims. Our own review of the record persuades us that substantial evidence supports the IJ's and BIA's rulings and we therefore deny the petition for review.

## I.

Petitioner Hem entered the United States in December 2003 on a non-immigrant visa that required her to depart by June 27, 2004. Mom had entered about a year earlier, in December 2002, using a passport in the name of Tek Kim Heng. On August 2, 2004, Hem filed an application for asylum and withholding of removal and also sought protection under the CAT. The application was denied, and both Hem and Mom subsequently received notices to appear for removal proceedings. Hem was charged with remaining in the United States longer than permitted in violation of § 237(a)(1)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(1)(B), and Mom

---

[1] Hem is the lead petitioner and Mom is seeking derivative asylum status.

was charged with failure to possess a valid entry document in violation of § 237(a)(1)(A) of the Act, 8 U.S.C. § 1227(a)(1)(A).

The IJ heard testimony on January 6 and July 15, 2005. In a lengthy written decision issued on November 3, 2005, the IJ denied all claims based on the petitioners' lack of credibility. On April 17, 2007, the BIA adopted and affirmed the IJ's decision, adding comments to explain why it found no clear error in the IJ's adverse credibility ruling.[2] In their petition for review, Hem and Mom challenge the credibility determination and assert that the record supports their claims for relief.

**II.**

**A. Applicable Law and Standard of Review**

To establish eligibility for asylum, an alien must prove either past persecution, which gives rise to an inference of future persecution, or establish a well founded fear of future persecution on account of her race, religion, nationality, membership in a social group, or political opinion. Ouk v. Keisler, 505 F.3d 63, 67 (1st Cir. 2007). The applicant bears the burden of proving that it is more likely than not that she will be persecuted. Mewengkang v. Gonzales, 486 F.3d 737, 739 (1st Cir. 2007).

_____

[2] The BIA also responded to Hem's argument that information may have been missing from the hearing transcript and that the hearing was otherwise unfair. Those issues have not been raised in this petition for judicial review and we do not consider them.

When the BIA has adopted and affirmed the IJ's ruling, but has included discussion of some of the IJ's bases for decision, we review both the IJ's and BIA's opinions. Lin v. Gonzales, 503 F.3d 4, 6-7 (1st Cir. 2007); Zheng v. Gonzales, 475 F.3d 30, 33 (1st Cir. 2007). In this case, both the IJ and BIA relied entirely on petitioners' lack of credibility in rejecting their claims for relief, and our review therefore focuses on "whether the adverse credibility determination is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Heng v. Gonzales, 493 F.3d 46, 48 (1st Cir. 2007) (quoting Simo v. Gonzales, 445 F.3d 7, 11 (1st Cir. 2006)). We will uphold the IJ's determination "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Hoxha v. Gonzales, 446 F.3d 210, 216 (1st Cir. 2006).

In evaluating the agency's credibility determination, we consider whether the reasons given by the IJ are specific and cogent and based on omissions and discrepancies in the record that were not adequately explained by the alien. Hoxha, 446 F.3d at 214, 217-220 (applying test from In re A-S-, 21 I & N Dec. 1106, 1109 (BIA 1998)); see also Castañeda-Castillo v. Gonzales, 488 F.3d 17, 22 (1st Cir. 2007) (en banc); Zheng v. Gonzales, 464 F.3d 60, 63 (1st Cir. 2006). However, "an adverse credibility determination cannot rest on trivia but must be based on discrepancies that 'involved the heart of the asylum claim.'" Bojorques-Villanueva v.

-4-

INS, 194 F.3d 14, 16 (1st Cir. 1999) (citation omitted) (quoting De Leon-Barrios v. INS, 116 F.3d 391, 393-94 (9th Cir. 1997)); see also Lin, 503 F.3d at 7; Mewengkang, 486 F.3d at 740.[3]

In the following sections, we summarize the evidence presented to the IJ and then discuss the IJ's and BIA's evaluation of that evidence.

## B. Summary of the Evidence

Hem stated in her affidavit that after the Khmer Rouge gained control of Cambodia in 1975, she and her family were forced to leave the city of Phnom Penh and, during this period, she witnessed one of her brothers being beheaded. In 1987, she married Khieng Hay Mom, who was studying to become a medical assistant, and started a business selling clothes in the Tek Thlar market. She stated that their lives were difficult because they did not support the Cambodian Peoples Party ("CPP") and its leader, Hun Sen. In 1989, her husband was sent to a dangerous area near the Thai border to care for injured soldiers and was nearly killed in an attack on the treatment center by the Khmer Rouge. After escaping with the help of friends, he stayed away from work for nine months for fear

---

[3] We previously have noted that, under the REAL ID Act of 2005, discrepancies "may support an adverse credibility finding 'without regard to whether [the] inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim,'" Lin, 503 F.3d at 7 n.2 (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). The new provision applies only to applications for asylum or other relief filed after May 11, 2005, and it is thus inapplicable here. Hoxha, 446 F.3d at 216 n.4.

of being sent back to the battlefield.  He returned to work because of threats that he would lose his government position, but later returned to school for his medical degree.

In February 1993, two of Hun Sen's policemen came to Hem's shop and threatened to close it unless she signed a statement of support for the CPP, which she reluctantly did.  In December 1995, Hem and Mom joined the Khmer National Party led by Sam Rainsy, and Hem was later verbally threatened on multiple occasions by Hun Sen supporters.  Although Mom graduated from medical school in 1996, he was unable to obtain a job as a doctor because he was not a member of the CPP.  He opened his own office, where Lieutenant Sem Rin and other policemen supportive of Hun Sen came to solicit political and financial support for the CPP.  Hem closed her clothing business to help her husband.

During a coup in July 1997, when Hun Sen's followers arrested and killed many political opponents, Hem, Mom and their two children fled to another part of Cambodia for a week.  Upon their return, they discovered that Mom's office had been vandalized, and a t-shirt with the CPP logo was left in the office. In March 1998, Hem and Mom continued their affiliation with Sam Rainsy by joining the newly established Sam Rainsy Party ("SRP"), and they "campaigned actively" in the Kampong Tralach District before the July 1998 election.  Hem reported that they were harassed "physically and verbally" by Hun Sen followers "[d]ue to

-6-

our popularity within the party." On April 13, 1998, Hem received a phone call that she believed was from Lieutenant Rin threatening that she should stop helping the SRP "or you'll be in big trouble." On election day in July, the couple were "almost killed" when their motorcycle was run off the road by a truck bearing the CPP logo in which Rin and another man were riding. Among other injuries to the couple, Hem said she needed six stitches to close a wound on her forehead.

Hem's affidavit lists a series of other threatening incidents between late 1998 and her departure from Cambodia: (1) on September 1, 1998, Lieutenant Rin came to her workplace "with a warning that he would feed me a bullet if I continue supporting SRP"; (2) twice in August 2001, all of the tires on Hem's car were slashed, and the second time, the assailant left a note "stating that we would be dead if we continued to support the SRP"; (3) in October 2001, several bullets hit Hem's office walls and shattered her windows;[4] (4) after the February 2002 local elections, in which Sam Rainsy members won seats in petitioners' district, Hem and Mom received more death threats when Hun Sen followers learned that Mom would be on the new electoral committee for the July 2003 election; (5) in March 2002, Lieutenant Rin encountered Hem in the local market and warned that she would be killed if she continued to help

_____

[4] At the hearing, Hem testified that the bullets hit her house. The discrepancy could be a translation error.

-7-

the SRP; (6) in June 2002, while Mom was closing his office, a man on a motorcycle fired at him twice. Both petitioners testified at the hearing that the man was Lieutenant Rin.

After the shooting incident, Mom closed his office and arranged to purchase a passport and visa under an assumed name. He left Cambodia at the end of 2002 without Hem. On two occasions in September 2003, after his departure, Lieutenant Rin traveled approximately fifty kilometers to Hem's home to ask about Mom's whereabouts. She testified that, on the first visit, Lieutenant Rin told her she would be killed if she did not find her husband. On the second visit, which took place at about 7 a.m., he searched the house, pointed a gun at her, and threatened to arrest her if her husband did not show up. On both occasions, Lieutenant Rin left without taking action. Hem testified that she was not actively involved in politics after her husband left the country.

Hem subsequently traveled to the United States with a passport containing photographs of three children depicted as hers, although she has only two. She testified that the third child is her niece and that she had told the passport agency that the girl was not her child. Mom's passport listed different children, but Hem stated that her husband deliberately used an assumed identity and false children's names because he was afraid he could not leave Cambodia if he provided accurate information. Hem also testified about her husband's travel to Vietnam and Thailand in 2002,

-8-

explaining that he was attempting to find a way to leave Cambodia and also was trying to show that he could be trusted to return to Cambodia if given a United States visa. Mom also testified that he took two trips to Thailand and one to Vietnam in 2002, stating that he feared remaining in Cambodia and wanted to explore the availability of asylum in Thailand, but also acknowledging that he was trying to make a good impression on the United States Embassy in Cambodia.

## C. IJ's and BIA's Evaluation of the Evidence

The IJ's decision included a detailed summary of the testimony given by both petitioners at the hearing and explained at length why the judge concluded that "[t]he testimony was neither consistent, nor sufficiently detailed to provide a plausible and coherent account of the basis of [Hem's] fear." The decision listed seven specific points of concern:

1. Both petitioners testified that Lieutenant Rin was the individual who shot at Mom from a motorcycle in June 2002, but Hem's affidavit had identified the assailant only as "a man on a motorcycle" – despite the fact that the affidavit included specific references to Rin in eight other paragraphs.

2. Hem did not mention the two tire-slashing episodes in her direct testimony, and her testimony about other alleged attacks on her house and threats against her was "vague and lacked

specificity of detail, as did her testimony about the political activities that allegedly motivated these threats."

3. Although Hem stated in her asylum application that she was subject to arrest in Cambodia and that her husband also was being sought by Hun Sen's policemen, she testified during cross-examination that there was no arrest warrant for either of them. She also testified that only Lieutenant Rin, and not the Cambodian government as a whole, was seeking their arrest.

4. The IJ found "inherently improbable" Hem's testimony that Lieutenant Rin twice traveled fifty kilometers to her home to inquire about her husband's whereabouts and threaten her. The judge noted that Hem did not explain how Rin knew where she was and why he would make the trips and then not carry out the threats.

5. Hem showed "very limited knowledge" of the Sam Rainsy Party and the political situation in Cambodia, which the IJ deemed inconsistent with her claim of persecution based on political activism. She could not explain the reasons for the military coup in 1997 that she claimed prompted her and her husband to go into hiding, and she did not know the name of the SRP representative from her district. She also had not been politically involved since coming to the United States and was unaware that the SRP had an office in the town where she lived (Lowell, Massachusetts).

6. Mom's testimony about the reasons for his brief trips to Vietnam and Thailand were not credible, and his testimony that

-10-

he took the trips because he felt in danger was inconsistent with Hem's explanation for the trips and "utterly inconsistent with his return to Cambodia the same day or two days later."

7.  Both petitioners admitted making false statements in their visa interviews at the U.S. Embassy, and Mom testified that he had presented false documents to obtain a U.S. visa.  Although acknowledging that false documents would not on their own necessarily undermine credibility, the IJ noted that the petitioners had not adequately explained why it was necessary for Mom, but not Hem, to travel under an assumed name and further questioned, inter alia, the listing of Hem's niece on her passport.

The IJ concluded that, "[t]aken as a whole, the above discrepancies do not concern 'trivia', but rather facts that 'go to the heart of the asylum claim,'" leading the judge to find that "neither respondent testified credibly, and therefore the respondents did not demonstrate eligibility for asylum."

The BIA's per curiam decision reviewed several of the inconsistencies, including Hem's failure to identify Lieutenant Rin in her affidavit as the individual who shot at her husband from a motorcycle.  The BIA noted that, because Hem testified that Rin was the only Hun Sen follower interested in her political involvement, and thus the only person whom she now fears, it was significant to her claim "whether he was the shooter or whether it was a different individual 'on a motorcycle' as the application indicates."  The

BIA also pointed out that her testimony that Lieutenant Rin was the only one interested in her contrasted with her application statement that she was generally subject to arrest by police authorities in Cambodia, and observed that "[t]his is a noteworthy difference regarding the nature of the threat and potential persecutor(s) she allegedly would face."

The BIA also pointed to Hem's failure to meaningfully challenge the IJ's finding that she had little political knowledge, concluding that "[t]he Immigration Judge did not clearly err in finding that the respondent's lack of political knowledge about her own party undercut the credibility of her assertions of political involvement." Although the BIA deemed Hem's failure to mention the tire slashing incidents in her direct testimony as less important, it observed that such an omission was "of concern" because Hem herself had few "direct and unambiguous difficulties" from Lieutenant Rin. The BIA also found it significant that Hem used her own name for traveling, but Mom felt compelled to use a false name.

Given these and other unexplained aspects of petitioners' testimony, the BIA found no clear error in the IJ's credibility determination and, consequently, concluded that Hem failed to meet her burden of proof for asylum and withholding of removal. The BIA also concluded that she had presented no credible evidence of

either past torture or the likelihood of future torture in Cambodia and thus was ineligible for CAT relief.

**III**.

After carefully reviewing the record in this case, we cannot conclude that the IJ was compelled to find the petitioners credible. Both the IJ and BIA carefully reviewed Hem's affidavit and the testimony presented at the hearing and provided thorough summaries of the evidence underlying their adverse credibility determinations. The IJ and BIA cited many concerns about the evidence, some of which go to the heart of petitioners' claim that they suffered persecution and face continuing danger in Cambodia based on their political opposition to Hun Sen and his followers. Petitioners testified that the episode that prompted Mom to depart from Cambodia was the shooting by Lieutenant Rin in June 2002, yet Hem's affidavit did not identify him as the shooter. In their brief to the BIA, petitioners suggested that the paralegal who transcribed the affidavit may not have recognized the significance of Rin's name, but that speculation is weak given that the affidavit contained many references to Rin. It seems unlikely that the importance of his role in a shooting episode could be overlooked. In addition, Hem testified that Lieutenant Rin was the only police officer seeking to arrest the couple. Thus, the IJ and BIA reasonably could give weight to Hem's failure to identify him specifically at the time the affidavit was prepared.

-13-

Relatedly, we cannot fault the IJ and BIA for doubting that Lieutenant Rin twice traveled fifty kilometers – roughly thirty-five miles – to Hem's home to threaten her nine months after her husband's departure from Cambodia and at a time when her own political activity was waning. In addition, the absence of detail in Hem's description of the couple's political involvement, her admission that she was not actively involved in politics after her husband left Cambodia, and her lack of continuing interest in Sam Rainsy activities after she moved to the United States also support the agency finding that she failed to present a credible account of political activism that was significant enough to trigger the shootings and death threats she reported. It remains unexplained why Hem, the lead petitioner, was able to use her own name on her passport and related materials, but her husband felt it necessary to purchase a fraudulent passport under an assumed name.

Where eligibility for asylum is based on the applicant's testimony alone, an adverse credibility determination "will usually doom her application." Lin, 503 F.3d at 7. So it is here. As described above, the IJ and BIA provided "specific, cogent, and supportable explanation[s]" for their credibility judgments, Simo, 445 F.3d at 11, and petitioners have therefore failed to meet their burden of proving either past political persecution or a well founded fear of future persecution. See, e.g., Zheng, 464 F.3d at 64 (noting the IJ's listing of ten independent grounds for his

-14-

credibility determination, "all involving conspicuous facts central to Zheng's religious persecution claim") (citing <u>Rodriquez Del Carmen</u> v. <u>Gonzales</u>, 441 F.3d 41, 44 (1st Cir. 2004), for the proposition that "vagueness and contradiction in material details of an alien's testimony support an adverse credibility determination"). They likewise have failed to establish eligibility for withholding of removal or CAT protection, as they have not shown by credible evidence that it is "more likely than not that [they] will be persecuted or tortured in [their] country of origin." <u>Sulaiman</u> v. <u>Gonzales</u>, 429 F.3d 347, 351 (1st Cir. 2005).

<u>The petition for review is denied.</u>