# United States Court of Appeals

## For the First Circuit

No. 07-1224

ROTANA TENG,

Petitioner,

v.

MICHAEL MUKASEY, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF

THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Stahl, Senior Circuit Judge.

Joseph A. MacDonald on brief for petitioner.
Katharine E. Clark, Office of Immigration Litigation,
Department of Justice, Peter Keisler, Assistant Attorney General,
Civil Division, and Barry Pettinato, Assistant Director, on brief
for respondent.

February 14, 2008

**BOUDIN**, <u>**Chief Judge**</u>.  Rotana Teng, a 41-year-old Cambodian national, entered the United States on July 27, 1997, overstayed his extended visa, and in October 2001, filed an application for asylum.  The Immigration and Naturalization Service began removal proceedings against Teng, who conceded removability, but requested asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  Hearings were held on his application in March 2004 and June 2005.

Teng said that his father, mother, sister, and two brothers were killed under Pol Pot's Khmer Rouge regime.  That regime, as is well known, murderously dominated the country for several years following its take-over in 1975.  Following an invasion by Vietnam in 1978, civil war ensued, slackening in the early 1990's and evolving into fierce rivalry between two other parties.  The grim history to the end of 1998 is recounted in the State Department country report of February 1999 offered in evidence by Teng.

According to Teng, he participated in a 1991 rally against the Vietnam-supported incumbent Hun Sen government, and in 1992 he joined the opposition FUNCINPEC party. At another rally in or around 1992, Teng was attacked by police and knocked unconscious; a friend of his was stabbed to death.  Following elections in 1993, the FUNCINPEC party and its leader entered a power-sharing arrangement with Hun Sen's party, and Teng obtained

a job at the post office.  In his new job, he found that members of Hun Sen's party were stealing from the post office.  He reported the information to the press and was himself accused of stealing and was fired in May 1997.

On the day of the firing, a fight broke out between Teng and some of the members of Hun Sen's party at the post office; Teng says that he and his brother, who came to his aid, were threatened by a man with a gun.  About three weeks later, Teng's brother was shot and killed.  Although it was classified as a robbery, Teng believed it to be a political murder related to the partisan fighting at the post office.  The following week, Teng obtained a visa to travel to the United States.  On July 5, 1997, military supporters of the Hun Sen regime launched a coup.

During this general period--roughly beginning in March of 1997--Teng was hiding in a nearby temple to avoid the increased threat of political violence.  He says that he would occasionally pay short visits to his home to see his wife.  On the night of the coup, he returned to his home and found that his wife and three-month-old daughter had been murdered.  Fearing for his life, he obtained a visa to travel to Thailand.  He went to Thailand on July 12, 1997, returned to Cambodia a few days later to retrieve money hidden in his home, and on July 26, 1997, flew to the United States.

At the close of the second hearing in June 2005, the immigration judge ("IJ") delivered a lengthy oral opinion denying Teng's requests for asylum, withholding of removal, and CAT relief, but granting voluntary departure. The IJ found that Teng's asylum application was untimely, that Teng was not a credible witness, and that the evidence did not support his claims that he had been persecuted or tortured or was likely to suffer persecution or torture if he returned to Cambodia.

On appeal, the Board of Immigration Appeals ("BIA") affirmed the IJ. Teng now seeks review in this court of his withholding and CAT claims but not his asylum claim.[1] He relies primarily upon claims that he was denied procedural due process, relegating an attack on the IJ's findings to a few pages at the close of the brief. It is true that the latter attack is made difficult by the deferential standard of review that applies to the agency's findings of fact and inferences from them; but the procedural claims--relating to allegedly inadequate translation and transcription--are quite weak and we begin with the merits.

---

[1]An asylum claim must ordinarily be filed within one year of arrival, 8 U.S.C. § 1158(a)(2)(B)(2000), which Teng failed to do. The main difference is that the asylum standard (well founded fear of persecution) is less demanding than the showings required to support withholding or protection under CAT. 8 C.F.R. §§ 1208.13(b) (standard for sustaining asylum claim); 208.16(b), (c)(2) (standard for sustaining withholding of removal and CAT claims).

To secure a withholding of removal on grounds of persecution, the applicant must show that he would be "more likely than not" to suffer persecution on one of the statutory grounds—here, because of political opinion—a standard that the Supreme Court has defined as a "clear probability."[2] INS v. Cardoza-Fonseca, 480 U.S. 421, 430 (1987). Further, "[i]f the applicant is determined to have suffered past persecution in the proposed country of removal . . . it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal." 8 C.F.R. § 208.16(b)(1)(i).

Teng offered no direct evidence of his likely treatment should he return to Cambodia; rather his case rests on the presumption that would be triggered if he established past persecution on political grounds. The deaths of Teng's parents and other family members under Pol Pot are horrible; but by the time of Teng's hearings, that regime had been out of power for many years. Teng's colorable basis for claiming any threat to himself based on a statutory ground focuses on the 1990s. Here, four incidents predominate.

The first, chronologically, is Teng's beating by soldiers in 1992 and the second his discharge from his government post in

---

[2]Alternatively, withholding under CAT can be achieved by showing "more likely than not" that torture would occur regardless of the ground, 8 C.F.R. § 208.16(c)(2), but there is no evidence that Teng has been tortured or would be tortured if he returned.

May 1997; assuming Teng's credibility, both could be regarded as contributing to a claim of persecution but neither alone nor together would they likely be enough under the precedents. See Nelson v. INS, 232 F.3d 258, 263-64 (1st Cir. 2000). The former was a one-time incident; the latter, not a threat to his life or liberty. See Alibeaj v. Gonzales, 469 F.3d 188, 191-92 (1st Cir. 2006). Much more serious are the deaths of his wife and daughter and of his brother.

Possibly these latter deaths were incidents of random violence preceding and accompanying the military coup, and do not evidence political persecution against Teng. But he was an active member of a political party; his brother was murdered in suspicious circumstances shortly after a partisan battle within the government-run post office; and Teng's wife and daughter were murdered during a coup as part of which Hun Sen's forces reportedly engaged in door-to-door searches for opponents.

Indeed, the IJ denied Teng's claim not because his story did not amount to persecution, but because she did not believe his testimony (a matter to which we return). The BIA, by contrast, did include one sentence in its affirmance suggesting as an alternative ground that "even if considered credible", Teng had not shown a likelihood of persecution because he "was never harmed in Cambodia." But the murders of Teng's wife and daughter, if intended to retaliate against Teng himself, could arguably

constitute persecution of him even though the violence was not directed personally at him.  Cf. Jorgji v. Mukasey, ___ F.3d ___, 2008 WL 192323, at *4 (1st Cir. 2008).[3]

The question remains whether Teng's story was true.  The IJ resolved the credibility issue against Teng, and we review that determination for substantial evidence; the findings below are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B); Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007).  Although that is a deferential standard, the IJ must provide "a specific, cogent, and supportable explanation" for rejecting an alien's testimony.  Heng v. Gonzales, 493 F.3d 46, 48 (1st Cir. 2007).

The IJ premised her adverse credibility determination in part on Teng's demeanor during the hearing; in part on inconsistencies and implausibilities in Teng's description of his behavior during the period surrounding the July 1997 coup; and in part on a series of minor inconsistencies in his testimony, which taken alone do not undermine his core narrative, but which could call into question Teng's general veracity.  We address these subsidiary determinations one by one.

---

[3]Under the cases, attacks on family can help show fear of future persecution. Ravindran v. INS, 976 F.2d 754, 759 (1st Cir. 1992); Arriaga-Barrientos v. INS, 937 F.2d 411, 414 (9th Cir. 1991).  We will assume arguendo that such attacks could also constitute past persecution against Teng himself, triggering the presumption.

The IJ noted during the hearing that Teng's demeanor was suspect and referred again to his demeanor in her oral decision. The IJ alone saw the witness, such judgments are partly intuitive and hard to articulate, and the IJ's judgment is entitled to some weight. <u>Cf.</u> <u>Heng</u>, 493 F.3d at 48. Still, a consistent story, independently supported in important respects and unmarred by implausibilities or inconsistencies, could not normally be disregarded merely because the witness--especially one from a different culture and unversed in English--simply struck the decision-maker as untruthful.

Certain aspects of Teng's account did have some independent support: that he was a member of the FUNCINPEC party, and that his brother, wife and daughter were murdered around the time of a bloody coup during which the supporters of Hun Sen targeted the opposition. Teng submitted his party membership card and death certificates, although those documents were not authenticated. News reports included in the record indicate that political killings and door-to-door searches did take place in July 1997 and many Cambodians fled to Thailand.

But Teng's testimony was also marked by discrepancies. Teng indicated that he was in hiding in a temple beginning in March 1997 because he feared political reprisals. Yet he apparently felt safe enough to show up to work at the government post office until his termination on May 10, 1997, report his brother's death to

government officials in June of 1997, travel in and out of the country in July using his Cambodian passport, and visit his house on the night of the coup, and again when he returned from Thailand to Cambodia on July 15.

Teng attempted to explain only his ability to travel through airport checks during the time that he was supposedly a target of those associated with the government party. To this extent the IJ had a rational basis for suspicion about a key aspect of Teng's testimony, even though another fact-finder might have thought that, given the turmoil in Cambodia at the time, Teng felt comfortable appearing in some locations--such as the post office-- and not others--such as his home.

The IJ also relied on a series of inconsistencies or contradictions in Teng's testimony. Some of the inconsistencies cited by the IJ do not accurately reflect the transcript[4] and others appear to be very minor.[5] In still other instances, Teng's

---

[4]For example, the IJ notes a contradiction as to whether Teng spent the time between July 15, 1997 and July 26 of that year hiding in his backyard or in a temple. But Teng explained that he hid in his backyard when police showed up at his home, and then escaped to the temple, where he remained until July 26.

[5]For example, at one point Teng erroneously identified the date of his brother's murder as May 10; but it appears from the record that he simply confused the date of his firing with the date of the subsequent shooting.

plausible attempts to reconcile alleged inconsistencies were rejected by the IJ without satisfactory explanation.[6]

At the same time, some of the IJ's concerns about inconsistency were legitimate--for example, Teng at one point claimed that his trip to Thailand preceded his wife's death but earlier had indicated that he fled to Thailand after finding the dead bodies; he also back-tracked when questioned about his reasons for renewing his Cambodian passport in 2000, once he was already in the United States. Thus, the IJ arguably overstated the number and importance of the inconsistencies, but enough remain to let them contribute to the overall finding.

Ultimately, it is not clear precisely which parts of Teng's testimony the IJ believed and which she discounted. But she expressed serious doubts about portions of Teng's testimony that go to the heart of his claim--the fact of and circumstances surrounding the deaths of his wife and child, his travels in and out of Cambodia around the time of the coup, and the nature and severity of the threat that Teng faced during that period.

At the end of the first hearing, the IJ made clear her doubts about his story, yet Teng made no effort to clarify his story or provide corroborating evidence from friends or family who

---

[6]For example, as to why certain documents referred to his mother as alive if she had indeed been killed during the Pol Pot regime, Teng explained that his widowed aunt had raised him after his mother's death; and that he considers her as a mother.

might have bolstered his claim.  Adding together the IJ's judgment about demeanor, the arguable oddity of Teng's core story as to on and off concealments and appearances and the limited but not trivial inconsistencies, the IJ's credibility determination finds adequate although not overwhelming support in the record considered as a whole.  Tum v. Gonzales, 503 F.3d 159, 161 (1st Cir. 2007).

We thus turn to Teng's main grounds of appeal, namely, his alleged due process claims.  We review a due process claim de novo, Aguilar-Solis v. INS, 168 F.3d 565, 568 (1st Cir. 1999), but not every procedural misstep or difficulty raises anything like a constitutional issue.  Procedural due process protects a right to a fundamentally fair proceeding; but few proceedings are perfect and one can have real errors, including ones that adversely affect a party's interests, without automatically violating the Constitution.

Teng says that he was denied due process first when he received inadequate translation services, and again when the BIA conducted its review based on an incomplete transcription of the proceedings before the IJ.  Teng was furnished at the hearing with a translator fluent in Cambodian, Mekhoukh v. Ashcroft, 358 F.3d 118, 128-29 (1st Cir. 2004); Matter of Tomas, 19 I&N Dec. 464, 465 (BIA 1987), and the claim of incompleteness rests on a modest number of "indiscernible" notations in the transcript of the oral testimony--a poor predicate for a due process claim.

-11-

Even if there were a substantial showing of manifestly inadequate translation, we would still ask "whether a more proficient or more accurate interpretation would likely have made a dispositive difference in the outcome of the proceeding." Harutyunyan v. Gonzales, 421 F.3d 64, 70 (1st Cir. 2005). Here, Teng does not point to any specific parts of his testimony that were mistranslated, claiming only generally that the translation services were inadequate. This is hardly enough. See Irianto v. Gonzales, 221 Fed. Appx. 485, 487 (8th Cir. 2007).

At one point during the March 2004 hearing, the IJ did ask the translator to enunciate better, but that occurred rather early in the proceedings, and does not appear to have been a recurring problem. At a later point the translator told the IJ that he was having difficulty understanding Teng, but he indicated that it was due to Teng's tendency to testify in incomplete sentences. A second translator, present during a subsequent hearing, expressed the same sentiment.

Teng's claim of inadequate transcription is similarly flawed. Teng was entitled to administrative review of the IJ's decision, which "demands a 'reasonably accurate, reasonably complete transcript,' or an adequate substitute, to allow for meaningful and adequate appellate review," Kheireddine v. Gonzales, 427 F.3d 80, 84 (1st Cir. 2005) (quoting Ortiz-Salas v. INS, 992 F.2d 105, 106 (7th Cir. 1993)); but to succeed on a claim of

inadequate or inaccurate transcription, he must at least "show 'specific prejudice to his ability to perfect an appeal' sufficient to rise to the level of a due process violation."  Id. at 85 (quoting United States v. Smith, 292 F.3d 90, 97 (1st Cir. 2002)).

He has not done so.  The record reveals a complete transcription of Teng's testimony before the IJ, with only a smattering of "indiscernibles" noted throughout the transcripts. The isolated ellipses do not prevent the reader from understanding Teng's testimony.  Indeed, the only specific omission noted in Teng's brief is a series of eight "indiscernible notions" in his testimony regarding his termination from a job at the Cambodian post office; but the transcript provides an essentially complete account of that episode.

The petition for review is denied.