# United States Court of Appeals

## For the First Circuit

---

No. 07-2186

SITHA LY,

Petitioner,

v.

MICHAEL B. MUKASEY,
UNITED STATES ATTORNEY GENERAL,

Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER OF THE

BOARD OF IMMIGRATION APPEALS

---

Before

Lipez and Howard, <u>Circuit Judges</u>,
and DiClerico, Jr.,[*] <u>District Judge</u>.

---

<u>Nairi M. Simonian</u>, Trial Attorney, <u>Jeffrey S. Bucholtz</u>, Acting
Assistant Attorney General, and <u>Michelle Gorden Latour</u>, Assistant
Director, on brief for respondent.
<u>Joseph A. MacDonald</u>, on brief for petitioner.

---

April 24, 2008

---

[*]Of the District of New Hampshire, sitting by designation.

**DiClerico, District Judge**.  Sitha Ly, a native of Cambodia, applied for asylum and withholding of removal and sought protection under the Convention Against Torture ("CAT").  The Immigration Judge ("IJ") found that Ly's asylum application was untimely, that Ly was not credible, and that even if her testimony were credited, she had not shown that it was more likely than not that she would be persecuted or subjected to torture in Cambodia.  The Board of Immigration Appeals ("BIA") adopted and affirmed the IJ's decision.  Ly appeals the decision denying her application for withholding of removal.

I.

In her application and her testimony before the IJ, Ly provided information about her background and described the circumstances that motivated her to leave Cambodia.  Ly stated that she was born in Cambodia in 1958.  She and her family experienced the repressive regime imposed by the Khmer Rouge.  Ly wrote that members of the Khmer Rouge murdered her grandfather, her father, her brother, and her sister.  In 1979, the Vietnamese overthrew the Khmer Rouge and installed Hun Sen as the ruler in Cambodia.

Ly was married in 1984, and worked with her husband, Thavy Nhao, in a clothing shop in the Orussei market in Daun Penh, Cambodia.  Ly and Nhao had four children born between 1985 and 1991.  In 1992, Ly and Nhao became active members of the FUNCINPEC

Party, in opposition to Hun Sen and his party, the Cambodian People's Party. Nhao recruited members for the FUNCINPEC Party, which Ly stated caused them to receive death threats from Hun Sen supporters. In July of 1992, a police lieutenant and Hun Sen supporter, Sok Vibol, happened to stop at Nhao's and Ly's home to avoid a rain storm. Nhao and Vibol argued, and Vibol warned Ly and Nhao that they would be in danger if they continued to support the FUNCINPEC Party.

After a national election in 1993, a coalition government was formed with the FUNCINPEC Party and the Cambodian People's Party. Nhao was given a job in the Department of Information as a writer for the government newspaper. Nhao worked with Hun Sen supporters, who disagreed with Nhao's positions. The Hun Sen employees warned Nhao to stay out of the Cambodian People's Party members' business to avoid harm to himself and his family.

In July of 1997, Hun Sen overthrew the government. FUNCINPEC Party members were arrested and killed. Ly, Nhao, and their children fled to the border with Thailand, where they stayed for three months. When they returned to Daun Penh, they found that their house and Ly's business had been severely damaged. Nhao and Ly switched to the Sam Rainsy Party, and Ly worked for the party. Ly's sister and her mother cared for Ly's children while she worked. Ly and Nhao again received death threats because of their political activities.

In April of 1998, Lieutenant Vibol came to their house during a political meeting and told them that the meeting was illegal and that Ly was in danger for supporting Sam Rainsy. After the meeting, while Ly and Nhao were sitting in their backyard with two party members, two individuals wearing uniforms drove by on a motorcycle, and the man sitting on the back fired a handgun at Ly and Nhao.

Despite Ly's and Nhao's efforts on behalf of the Sam Rainsy Party, Hun Sen won the election in July of 1998. Sam Rainsy and others charged that Hun Sen had won by fraud. Those who opposed Hun Sen demonstrated against the election, and Ly was active in organizing the demonstrations.

On September 9, 1998, Ly organized and led a demonstration of about 100 Sam Rainsy supporters at the National Assembly. About 10,000 demonstrators joined them. Ly was at the front of the crowd holding a banner when about 500 of Hun Sen's armed forces attacked the demonstration. Two police officers hit Ly, and she fell to the ground. She was arrested, along with other demonstrators, and was taken to the police station where Vibol slapped her and pushed her against the wall. She was kept overnight in jail without food. Vibol told her that she would be killed if she continued her political activities. She was released the next day.

Life was relatively uneventful for the next two years. In October of 2000, two men on a red motorcycle shot at Nhao and Ly as they left their house to attend a wedding. They dove for cover and were not injured, although six bullets hit the wall of the house. Ly and Nhao discussed their safety, and Ly decided to apply for a visa while Nhao wanted to stay and fight for freedom.

The next incident occurred in November of 2000, when Vibol came to Ly and Nhao's house with other policemen. Ly described the November incident twice in her application for asylum and withholding of removal and again in her testimony to the IJ. In her affidavit filed in support of her application, Ly said that Vibol and the police came to arrest Nhao and that while they walked Nhao to the car, she was handcuffed. On the application form itself, Ly answered a question about whether she or any of her family had ever been, among other things, arrested, by stating that her husband had been arrested. She explained that on November 23 Hun Sen set up a shooting and falsely accused the Cambodian Freedom Fighters of the shooting. The next morning, which would have been November 24, Vibol and two other policemen came to arrest Nhao and accused him of aiding the Cambodian Freedom Fighters. She stated: "The following night they took my husband to Daun Penh police station for interrogation."

Ly's counsel explained at the hearing that Ly wanted to correct a mistake in the asylum application about the November

incident. Ly then testified that Vibol and four policemen came to their house on November 23, arrested Nhao, tied his arms, and took him to their car. She testified that they also tied her with string and forced her to kneel down. After giving Nhao a warning, Vibol and the other policemen released him. In response to her counsel's questions, Ly repeatedly stated that the police took Nhao to the car but did not take him to jail.

Ly left Cambodia and arrived in the United States on December 26, 2000. In October of 2001, Nhao told Ly that he wanted to come to the United States because Hun Sen's followers had attempted to cause him serious injury. Nhao warned Ly not to return to Cambodia. Ly's sister, who was staying with her family, called Ly on October 20, 2001, to report that Nhao had disappeared. On February 14, 2002, Ly's sister told her that Nhao's body had been found in a rice field and that he had been robbed and murdered. Ly's children remain in Cambodia and live with her sister.

A hearing was held on December 19, 2005, on Ly's application for asylum and for withholding of removal. The IJ concluded that Ly's asylum application was untimely and denied asylum on that basis. He held that Ly was not credible, based on the differing versions of the November incident. The IJ also held that even if Ly were credible, she had not shown a basis for withholding of removal because she had experienced only periodic

reprisals for her political activities, not persecution or torture; the violence Ly and Nhao had experienced was due to criminal activity rather than politically motivated persecution; the United States Department of State's 2004 Country Report on Cambodia indicated that circumstances had improved since 2001; and Ly's children and her sister continued to live in Cambodia without persecution.

The BIA adopted and affirmed the IJ's decision with some added discussion. The BIA held that the IJ's adverse credibility determination was not clearly erroneous. In addition, the BIA noted: "Nor do we find that any translation errors in any way detracted from the meaning of the respondent's statements and in no manner deprived her of a full and impartial hearing." AR at 002.

## II.

On appeal, Ly challenges the IJ's adverse credibility determination and the alternative conclusion, on the merits, that she did not show that she would be persecuted if she were returned to Cambodia. The government argues that Ly waived appeal of that part of the decision denying her application for asylum and contends that substantial evidence supports the adverse credibility determination and the decision on the merits.

Ly, appropriately, did not appeal the decision denying her application for asylum. This court lacks jurisdiction to

review a decision based on the timeliness of an asylum application. 8 U.S.C. § 1158(a)(3); Rotinsulu v. Mukasey, 515 F.3d 68, 71 (1st Cir. 2008). The government's argument that the issue of asylum was waived is inapposite.

A.    Standard of Review

When the BIA has adopted and affirmed the IJ's decision and also adds some of its own discussion or analysis, this court reviews both decisions. Hem v. Mukasey, 514 F.3d 67, 69 (1st Cir. 2008). We will uphold the factual findings of the IJ and BIA "if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." Acevedo-Aquilar, v. Mukasey, 517 F.3d 8, 9 (1st Cir. 2008)(internal quotation marks omitted). Legal conclusions are reviewed de novo. Wang v. Mukasey, 508 F.3d 80, 84 (1st Cir. 2007).

B. Credibility

In making a credibility determination, "the IJ must provide a specific, cogent, and supportable explanation for rejecting an alien's testimony." Teng v. Mukasey, 516 F.3d 12, 16 (1st Cir. 2008) (internal quotation marks omitted). The IJ's determination must also be "based on omissions and discrepancies in the record that were not adequately explained by the alien." Hem, 514 F.3d at 69. An IJ's credibility determination is "'conclusive

unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Teng, 516 F.3d at 16 (quoting 8 U.S.C. § 1252(b)(4)(B)). When a credibility determination is based on discrepancies in an alien's testimony rather than on her demeanor while testifying, however, the IJ's conclusion that she was not credible is entitled to less deference. Heng v. Gonzales, 493 F.3d 46, 48 (1st Cir. 2007).

The IJ stated that one inconsistency in Ly's testimony convinced him that she was not credible. The cited inconsistency was the different descriptions Ly provided of the incident that occurred in November of 2000, involving Lieutenant Vibol, other policemen, Ly, and Nhao. The IJ notes that in her asylum application Ly stated that Nhao was taken to the police station for questioning but that in her testimony during the hearing she "was adamant that she was tied and made to lie on the floor while her husband was tied and taken to the police car and then allowed to return to the house." The IJ concluded that there was a "significant discrepancy" between the two versions of the incident. Because the IJ believed that the November incident was the most serious event that she and Nhao experienced, the inconsistency went "directly to the heart of the respondent's application."[1]

---

[1]Until changed by the REAL ID Act of 2005, nonmaterial discrepancies in an alien's story were not sufficient to support an adverse credibility determination. Hem, 514 F.3d at 69 n.3. Because Ly's application was filed before the effective date of the Act, the previous standard applies. Id. Therefore, the IJ's

-9-

In making the adverse credibility determination, the IJ ignored the circumstances in which the inconsistency was revealed. At the hearing, Ly corrected her own statement voluntarily, not as a result of cross examination. Ly testified that she had not said that Nhao was taken away from the house other than out to the car. To the extent the IJ disputes Ly's testimony about whether she was handcuffed or tied, that discrepancy is minor and likely due to differences in translation as Ly herself suggested.[2] Of the three versions of the event, two are substantially consistent, which supports Ly's testimony about what happened.

The IJ's finding was based entirely on the perceived inconsistency in Ly's testimony and not on her demeanor as she testified. Because Ly explained the inconsistency in her versions of the November incident and the circumstances suggest a mistake rather than a lack of credibility, the IJ did not provide a supportable explanation for rejecting Ly's testimony. The IJ did not stop with the adverse credibility finding, but instead, also

_____

adverse credibility determination "cannot rest on trivia but must be based on discrepancies that involved the heart of the [withholding of removal] claim." Id. at 69 (internal quotation marks omitted).

[2]Although the BIA found no translation errors that "in any way detracted from the meaning of the respondent's statements," our review of the documents and the hearing transcript indicates that some of the translation was considerably more coherent than other parts. Ly does not contend on appeal, however, that the translation or transcription services she received impaired her ability to present her case. Cf. Teng, 516 F.3d at 17-18.

considered Ly's testimony as if she had been found to be credible. Therefore, we consider the IJ's and BIA's holding on the merits of Ly's claim for withholding of removal.

## C.  Withholding of Removal

To qualify for withholding of removal, an alien must show, by a clear probability, that she will be persecuted based on a protected ground if she is returned to her native country.[3] Rotinsulu, 515 F.3d at 71; see 8 U.S.C. § 1231(b)(3)(A).  That burden may be satisfied by proving either that she will suffer persecution if she is returned or that she suffered past persecution, giving rise to a rebuttable presumption of future persecution.  8 C.F.R. § 1208.16(b); see also Hana v. Gonzales, 503 F.3d 39, 42 n.2 (1st Cir. 2007).  When the presumption is triggered, the burden shifts to the government "to prove that the alien can return safely to [her] native land."  Rotinsulu, 515 F.3d at 72.

"Past persecution requires that the totality of a petitioner's experiences add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment."  Sela v. Mukasey, ___ F.3d ___, 2008 WL 664081 at *2 (1st Cir. Mar. 13, 2008) (internal quotation marks omitted).  A petitioner must show either

---

[3]On appeal, Ly did not pursue her claim of torture in support of protection under the CAT, and therefore, that basis for her application is deemed waived.  See Chreng, 471 F.3d at 15 n.1.

that she would be singled out for persecution in her native country or that a pattern or practice exists of persecuting a group of which she is a member or with which she is identified. <u>Kho</u> v. <u>Keisler</u>, 505 F.3d 50, 45 (1st Cir. 2007). A petitioner must also show that the persecution is the direct result of "government action, government-supported action, or government's unwillingness or inability to control private conduct." <u>Id.</u> at 58 (internal quotation marks omitted).

On the application form, Ly checked boxes for "Membership in a particular social group" and "Torture Convention" as the bases for withholding of removal. During the proceeding before the IJ, Ly testified about her own and her husband's political activities as the reason for the adverse treatment they received. In making his decision, the IJ focused on Ly's and her husband's political activities and politics in Cambodia, but found that Ly had not shown persecution based on any protected ground. It appears that the basis for Ly's application for withholding of removal is that she was persecuted because of her political opinion although it may also be that she was persecuted based on her political party membership. <u>See</u> § 1231(b)(3)(A) (listing protected grounds).

The IJ and BIA concluded that Ly's experiences in Cambodia did not amount to persecution and that the violence Ly and Nhao experienced was due to criminal activity rather than political motivation. Contrary to the IJ's findings, the experiences and

-12-

circumstances Ly describes were perpetrated, at least in part, by members of the police force and Hun Sen supporters. In addition, the level of threats, violence, and intrusion into their lives, culminating with Nhao's murder, suggest something more than mere harassment, unpleasantness, or basic suffering. Therefore, Ly was entitled to a presumption that she would suffer persecution if she returned to Cambodia.

Based on the State Department's 2004 Country Report, the IJ concluded that the political circumstances in Cambodia had changed. The IJ noted that elections resulted in the Sam Rainsy Party holding twenty-four seats in the national assembly, along with members of Hun Sen's party and the FUNCINPEC Party. The IJ also noted that the Country Report showed that politically motivated violence was less than in previous elections and that Ly's four children and her sister lived in Cambodia without harm.

While the State Department's Country Reports are not binding, they are probative of the conditions in the reported country. Chreng, 471 F.3d at 21. Abstract evidence in a report about the general conditions in the country will not be enough to rebut a presumption of persecution or to overcome an alien's specific evidence about the current conditions in the country. Id. "However, where a report demonstrates fundamental changes in the specific circumstances that form the basis of a petitioner's presumptive fear of future persecution, it may be sufficient, in

-13-

and of itself to rebut that presumption." Id. at 22 (internal quotation marks omitted). Further, "'[t]he fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits [her] return.'" Ouk v. Gonzales, 464 F.3d 108, 111 (1st Cir. 2006) (quoting Aguilar-Solis v. INS, 168 F.3d 565, 573 (1st Cir. 1999)).

Ly provides no specific evidence of the conditions in Cambodia pertinent to the IJ's decision. She argues that the 2004 Country Report does not support the IJ's conclusion because, although it states that politically motivated killings had decreased, some killings had occurred in 2004. She also notes that the Report states that Cambodia's human rights record is poor and that the government lacks resources to restrain members of the local and national security forces.

We have previously held that Country Reports for Cambodia provided substantial evidence to support the finding that a presumption of persecution was rebutted by the then-existing circumstances, such as shared political power and other improvements in conditions. See Chreng, 471 F.3d at 22; Ouk, 464 F.3d at 111. In contrast, earlier Country Reports for Cambodia present a much different picture. See Un v. Gonzales, 415 F.3d 205, 209 (1st Cir. 2005); see also Choub v. Gonzales, 2007 WL 2316919 at *2 (9th Cir. Aug. 14, 2007) (discussing 2002 Country Report for Cambodia). Although the 2004 Country Report does not

paint a rosy picture of human rights and other conditions in Cambodia, in the absence of specific evidence to the contrary, the circumstances of shared political power and a decrease in politically motivated violence support the IJ's conclusion.

The IJ also noted that Ly's family was living safely in Cambodia. Ly contends that her persecutors had achieved their goals by driving her out of Cambodia and by killing Nhao. She argues that there would be no reason to target their children because of their parents' political activities. While she may be correct, she has provided no specific evidence to support her position or to rebut the government's evidence that conditions have changed for the better in Cambodia. Therefore, the presumption that Ly would face persecution if she were returned to Cambodia is rebutted by the evidence of changed conditions there. Substantial evidence supports the conclusion of the IJ and the BIA that Ly does not qualify for withholding of removal.

III.

For the foregoing reasons, Ly's petition for review is denied.