# United States Court of Appeals
## For the <u>First Circuit</u>

No. 14-2198

RADCLIFFE DAVIS,

Petitioner,

v.

LORETTA E. LYNCH,[*]
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

---

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

---

Before

Torruella, Lynch, and Lipez,
<u>Circuit Judges</u>.

---

<u>Joshua Daley Paulin</u> and <u>Law Offices of Joshua Daley Paulin</u>, on brief for petitioner.
<u>Monica Antoun</u>, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, <u>Benjamin C. Mizer</u>, Acting Assistant Attorney General, and <u>Shelley R. Goad</u>, Assistant Director, on brief for respondent.

---

September 21, 2015

---

[*]    Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Loretta E. Lynch is substituted for former Attorney General Eric H. Holder, Jr. as respondent.

**TORRUELLA, Circuit Judge.** Petitioner Radcliffe Davis petitions this court to review a decision of the Board of Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") decision that Davis did not enter into his marriage to Nadine Woodley Davis ("Woodley") in good faith, but rather for the sole purpose of circumventing immigration laws. He also contends that the BIA erred when it refused to remand the proceedings to the IJ given his recent marriage to another United States citizen. For the reasons that follow, we deny the petition.

## I. Background & Procedural History

We recount the facts as Davis testified to them before the agency, except where otherwise noted. Davis is a forty-five-year-old native and citizen of Jamaica who legally entered the United States on a visitor visa on December 19, 2007. On October 21, 2008, he adjusted his status to that of a conditional permanent resident based on his marriage to Woodley, a United States citizen, on April 19, 2007. This status terminated on October 21, 2010, when the United States Citizenship and Immigration Services ("USCIS") denied Davis's request for a waiver of the requirement that he file a joint petition with Woodley to remove the conditional status. According to the USCIS, Davis, who had since divorced Woodley, failed to submit evidence "to establish that [his] marriage to Nadine Davis was in good faith and not

-2-

entered into for the sole purpose of circumventing immigration laws."[1]

Given this waiver denial, the Department of Homeland Security ("DHS") initiated removal proceedings by filing a Notice to Appear with the Immigration Court on March 20, 2012. The Notice charged Davis with removability under 8 U.S.C. § 1227(a)(1)(D)(i) -- removability due to the termination of a conditional permanent resident status. Davis conceded removability but requested termination of proceedings, adjustment of status, and a review of the waiver application. In the event all of that was denied, he also sought voluntary departure.

## A. The Immigration Judge Proceedings

A hearing was held before an Immigration Judge ("IJ") on May 22, 2013, during which Davis was the only witness. He testified that he was born in Kingston, Jamaica, had never

---

[1] Under the Immigration and Nationality Act, an alien who marries a United States citizen is entitled to petition for permanent residency on a conditional basis. 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A)(i), (ii), 1186a(a)(1). Within ninety days of the second anniversary of the conditional admission, the couple may jointly petition for the removal of the condition. Id. § 1186a(c)(1)(A). If, however, the couple has divorced within this two-year time frame, the alien spouse must apply for a "hardship waiver" to remove the conditional nature of his or her admission. Id. § 1186a(c)(4). Such a waiver may be granted if "the qualifying marriage was entered into in good faith by the alien spouse, but the qualifying marriage has been terminated (other than through the death of the spouse) and the alien was not at fault in failing to meet the [joint filing] requirements." Id. § 1186a(c)(4)(B); see also Jing Lin v. Holder, 759 F.3d 110, 111 (1st Cir. 2014).

previously been married, and had two children -- a son and a daughter -- of whom he had custody.

According to Davis, he met Woodley in August 2006 at a club in Kingston while Woodley was on a three-week vacation. Even though they met the Friday before the Monday Woodley was scheduled to leave Jamaica, the two saw each other again before Woodley left. They also continued to stay in touch; Davis testified that they spoke by phone three or four times per day and emailed "very frequently." He later testified that the two emailed with each other every day.

Davis then began discussing his and Woodley's visits with each other. He testified that he came to the United States to visit her, but could not remember exactly when. He first thought it might have been 2006, but then corrected the date to 2007, though he could not specify the exact dates. Davis did, however, remember that Woodley visited him in Jamaica for two weeks at the end of 2006. During this visit, Woodley stayed at Davis's house, met his family, and developed a romantic relationship with Davis. Davis added that Woodley made one other weekend trip to Jamaica but could not recall exactly when this occurred.

Following this exchange, Davis was once again asked when he flew to the United States to see Woodley, but he still could not remember the date. Davis's counsel requested permission to use Davis's passport to refresh Davis's recollection as to when he

-4-

visited the United States because Davis was "giving the wrong dates," but DHS objected. It based this objection on two grounds: that the question had already been asked and answered; and that DHS had not had the opportunity to inspect the passport. The IJ sustained the objection on both grounds, noting that "[a]ny document that was going to be used during the proceedings should have been submitted to the Court."

Without the passport to assist him, Davis stated that he first came to the United States in 2006 to visit a friend on Long Island, New York. When directed to focus on his first visit with Woodley, Davis testified that he visited her for two weeks, stayed at her house, met her extended family, and continued to cultivate a romantic relationship. Davis then proceeded to discuss a second two-week visit with Woodley over Thanksgiving, during which he stayed with Woodley and celebrated Thanksgiving at Woodley's uncle's house.

Davis testified that his next trip to the United States was on April 7, 2007, on a two-week visitor visa. Davis once again stayed with Woodley. During this trip, Woodley raised the topic of marriage. Davis testified that he had wanted to bring up the topic as well but did not know how, so he was happy that Woodley did it first. The two married on April 19, 2007. A few days later -- Davis could not recall the exact date -- Davis returned to Jamaica. Though Woodley did not go with him, the two stayed in "stronger

-5-

contact" and spoke on the phone and emailed regularly. According to Davis, Woodley called him at 4:30 p.m. every day.

Davis could not recall whether Woodley visited him in Jamaica after their marriage, but he did remember that the next time he visited Woodley was on December 19, 2007. In preparation for the trip, Davis visited the United States Consulate on November 16, 2007, and November 26, 2007, to obtain visitor visas for himself and his children. He could not remember what he told the Consulate, though documents showed that he listed Nadine Woodley as his contact and declared himself to be single.

Davis testified that his initial plan was only to visit Woodley, but Woodley wanted him to stay. According to Davis, he initially rejected this request because his children were in school in Jamaica, he had a good job in Jamaica, and he had a house in Jamaica, but Woodley was persistent. Davis eventually acquiesced and called his employer, explaining that he had to quit his job because Woodley needed his help and wanted him to stay.

Accordingly, Davis and his children remained in the United States, living with Woodley and her daughter at a Dorchester, Massachusetts, address. Davis explained that Woodley worked and was the sole provider while he stayed home and took care

of the family and the house.[2]  According to Davis, he was happy that they were all living together.

The relationship apparently soon deteriorated.  One October -- Davis could not remember the year -- Davis and Woodley attended an interview on Davis's request for residency during which Davis told the interviewer that his relationship with Woodley was "good, but we had problems and were trying to fix them."  Davis admitted, however, that their problems were actually a "little severe."  Elaborating, Davis testified that Woodley was "rude" and that they had their differences.  For example, he described an incident where Davis's son -- at the urging of Davis's daughter and Woodley's daughter -- bought $200 worth of toys with Woodley's credit card and the two disagreed over how to handle the situation.

Despite these problems, Davis testified that at no point did he ever think about terminating the relationship; to the contrary, Davis suggested that he and Woodley attend counseling. According to Davis, he and Woodley attended two sessions with their pastor, but the sessions were unsuccessful.  Woodley moved out in December 2008, and their divorce became final on February 15, 2011.

Davis also testified about his and Woodley's tax filings. He explained that, for the 2007 taxable year, Woodley used a professional tax preparer, and he was not involved in their

---

[2]  Davis later completed a certification course and obtained a job at the Boston Park Plaza Hotel in mid-2008.

discussions; still, Davis did not dispute that Woodley filed as head of household and not as a married individual. As for the 2008 taxes, Davis explained that he filed as a married but separated individual and that he filed his own taxes because he had started working in August 2008 and he was no longer living with Woodley by the end of 2008.

In addition to Davis's testimony, a number of documents were introduced. First, he provided three letters: (1) an undated and unsworn letter from Woodley describing Davis as "very loving and good to me and my children" and asking that she and Davis be given "a chance to be with each other"; (2) an unsworn letter from Woodley's elder daughter[3] stating that Davis "is a good husband to my mother" but also noting that Davis "made a big mistake not thinking" and would "never do anything like that again"; and (3) an unsworn letter from one of Woodley's coworkers and friends stating that "[e]ver since Nadine met [Davis] she has been the happiest woman I've ever known" and asking that her "dear friend [have] a chance to live the life most women dream of." Davis also submitted (1) his marriage certificate; (2) his divorce certificate; (3) a Tufts Health Plan for Woodley, Davis, and two others; (4) copies of credit and debit cards listing both Woodley and Davis as account holders; (5) a letter from Verizon listing both Woodley and Davis

_____

[3]    Although the record is not entirely clear, it appears that Woodley has a second daughter who did not live with Woodley.

as subscribers and confirming a change to a calling plan as of September 16, 2008; (6) Woodley's driver's license, listing a residence in Dorchester, Massachusetts, as the address on the front but a residence in Roxbury, Massachusetts, as an alternate address on the back; and (7) several undated photographs with unidentified individuals.

Meanwhile, DHS submitted documents showing that Woodley tried on two occasions -- once on January 12, 2009, and once on February 10, 2009 -- to withdraw the visa petitions she filed on Davis's behalf. It also introduced an undated letter from Woodley. All three documents refer to Davis mistreating Woodley and marrying her only in order to obtain a green card. The letter, for example, stated that the "marriage is not legit" and that Davis had a "girlfriend in Jamaica." Davis objected to these documents on the ground that they were not notarized and thus were not properly authenticated. The IJ ruled that it would "admit them into evidence over that objection" but would "entertain the objection as to evidentiary weight, the same as [it] will consider for the documents [Davis] submitted from individuals, likewise, not notarized." Outside of this objection, Davis had no response to the documents and could not otherwise explain them.

After receiving this evidence, the IJ issued its oral decision not to grant Davis's application. According to the IJ, Davis had "not met his burden of establishing that [he] was not at

fault for not meeting the requirements of a joint petition." Specifically, it found that there was little evidence to show any commitment to the marital relationship. The IJ based this decision on a number of factors: (1) that there was no evidence that Davis and Woodley commingled financial assets and liabilities; (2) that there was no concrete evidence of cohabitation after Davis moved to the United States; (3) that the letters submitted by Davis were not notarized and that the writers were not presented for in-court testimony and cross-examination; (4) that the photographs provided by Davis were undated and the people depicted in the photographs were unidentified; (5) that Davis never explained why Woodley's driver's license contained two addresses or why the alternate Roxbury address appeared on Woodley's earning statements; (6) that Davis provided no proof to corroborate his testimony that he and Woodley spoke three or four times a day and emailed daily; (7) that Davis provided no proof -- such as photographs or airline tickets -- that Woodley visited him in Jamaica or vice versa; (8) that Davis provided no letters from anyone who attended the respondent's wedding, from neighbors who knew the couple, or from the children who lived with Woodley and Davis; (9) that Davis provided no proof of his and Woodley's counseling sessions with their pastor; (10) that Davis provided no evidence to corroborate his testimony of a joint bank account at Citizens Bank; and (11) that Davis was unable to recall when he visited Woodley in the United States and gave

inconsistent testimony, specifically his inconsistent testimony regarding a Thanksgiving visit.

Given all of this, as well as DHS's evidence that Davis told the Consulate in Jamaica that he was not married and that Woodley had twice attempted to withdraw the visa petition -- none of which Davis was able to explain -- the IJ had "serious doubts about the credibility of [Davis's] testimony" and believed that "the evidence point[ed] to a marriage entered into for the sole purpose of circumventing Immigration laws." Accordingly, the IJ denied Davis's waiver petition and ordered him removable. The IJ also denied Davis's request for voluntary departure, explaining that his attempt to enter into a sham marriage "bars him from establishing the required good moral character for post-hearing voluntary departure," and that, even if the IJ did have discretion to grant voluntary departure, it would not do so because Davis had "not offered any evidence of favorable equities."

## B. The BIA Proceedings

Davis appealed the IJ's denial of his waiver to the BIA on June 18, 2013.[4] As part of his appeal, Davis submitted additional evidence, such as: (1) checking account statements from Citizens Bank for Woodley and Davis dating from September 5, 2008, through January 6, 2009; (2) a print-out of Davis's email account

---

[4] Davis did not appeal the IJ's denial of his request for voluntary departure.

-11-

inbox showing messages to Woodley from October 9, 2006, through December 17, 2007; (3) a housing rental application for a Roxbury, Massachusetts, address completed by Woodley and Davis and signed on March 24, 2008; (4) a checklist for an interview conducted on August 15, 2008, in connection with the rental application; and (5) a one-year lease agreement signed by Woodley and Davis on August 15, 2008.

On July 22, 2014, while his appeal was still pending, Davis filed a motion to remand. He based this motion on a visa petition filed on his behalf by Marie Bryan Davis ("Bryan"), whom Davis had married on June 28, 2013. In support of the motion, Davis attached an affidavit by Bryan describing her and Davis's relationship and courtship. Bryan -- a native of Jamaica who became a United States citizen on November 30, 2009 -- explained how she first met Davis when they lived in the same neighborhood in Jamaica but that they "never really spoke much." This changed when she visited Jamaica in December 2009 and the two renewed their acquaintance. Following this visit, the two spoke by phone "every now and then" and Davis would ask about Bryan's sick husband. After Bryan's husband's death in July 2010, Davis offered to attend the funeral but Bryan asked him not to. Davis agreed, and instead visited Bryan in Atlanta in October 2010 for his birthday. This was the beginning of their romantic relationship, which continued with Bryan visiting Davis in Boston in March 2011 for her birthday,

Davis visiting Bryan again in the summer of 2011, and Davis and his children spending Christmas with Bryan and her family in Atlanta in 2011. In 2012, the two began discussing marriage. After debating when to get married and where to live, they agreed on Boston and wed on June 28, 2013. According to Bryan, she and Davis married because they love each other.

In addition to this affidavit, Davis submitted the following documents: (1) an I-130 visa petition filed by Bryan; (2) Bryan's naturalization certificate; (3) Bryan and Davis's marriage certificate; (4) Bryan's husband's death certificate; (5) Davis's divorce certificate from Woodley; and (6) notices regarding the processing of their visa petition.

The BIA dismissed Davis's appeal on October 25, 2014. After briefly recounting the facts and the IJ's decision, the BIA adopted and affirmed the decision of the IJ. The BIA based this conclusion on the fact that Davis "submitted very little documentary evidence of the bona fide nature of his marriage, and his testimony was vague and, at times, confused and inconsistent." The BIA specifically refuted Davis's attempt to argue that his testimony was not inconsistent, pointing to his testimony about when he and Woodley visited each other (specifically over Thanksgiving), his "long pauses during this portion of the testimony" which the IJ "may make inferences from," and his inability "to explain why he apparently told immigration

-13-

authorities, when he applied for a visitor visa in November of 2007, that he was single, when he married [Woodley] on April 19, 2007."

The BIA also noted that Davis "submitted minimal corroborative evidence to support his claim" even though there was "other documentary evidence that should have been readily available," and it rejected Davis's argument that the IJ unfairly weighed the evidence and disregarded his testimony. According to the BIA, the IJ "considered all the evidence of record and found it insufficient to meet [Davis's] burden of proof." It added that the IJ was "permitted to make reasonable inferences among the plausible possibilities and explanations for discrepancies in the record and . . . did so here."

As for the newly submitted evidence, the BIA refused to consider it, explaining that the BIA "does not review evidence first presented on appeal" and that Davis failed to show "that any of this evidence was not available at the time of his hearing." Even putting the procedural issue aside, the BIA concluded that "given the serious problems with his testimony and evidence before the [IJ]," Davis failed to show "that the evidence is material to his application and [would] likely change the outcome of his case."

Finally, the BIA turned to Davis's motion to remand. It noted that the visa petition had not yet been approved but acknowledged that the BIA could still grant a remand in the

exercise of its discretion. In this case, however, the BIA declined to do so because "clear and convincing evidence should be presented indicating a strong likelihood that the marriage is bona fide" and Davis failed to provide such evidence. The BIA pointed out that Davis submitted the visa petition, a statement from Bryan, the marriage certificate, and a few other official documents, but nothing that would "provide clear and convincing evidence of the likelihood of the bona fides of the marriage," such as "documentation showing co-mingled assets, cohabitation, and other indicia of a bona fide marriage."

Accordingly, the BIA dismissed Davis's appeal of the IJ's decision and denied his motion for remand due to his new visa petition. This timely petition for review followed.

## II. Discussion

### A. The Denial of Davis's Waiver Petition

Davis argues that both the IJ and the BIA erred in denying his waiver petition. His argument appears to take two forms: first, that the IJ violated Davis's due process rights when it refused to allow Davis's counsel to use Davis's passport to refresh his recollection but allowed DHS to introduce the three unsworn statements from Woodley; and second, that he presented sufficient evidence to establish a bona fide marriage to Woodley. We address -- and reject -- each in turn.

-15-

"Where the BIA adopts the IJ's opinion and discusses some of the bases for the IJ's decision," we have authority to review both opinions. Jing Lin v. Holder, 759 F.3d 110, 112 (1st Cir. 2014) (internal quotation marks omitted). We review the factual findings under the "quite deferential" substantial evidence standard. Id. (quoting Kinisu v. Holder, 721 F.3d 29, 34 (1st Cir. 2013)). This means that we will uphold the decisions if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole," Acevedo-Aguilar v. Mukasey, 517 F.3d 8, 9 (1st Cir. 2008) (quoting Carcamo-Recinos v. Ashcroft, 389 F.3d 253, 256 (1st Cir. 2004)), and will only disturb the findings where "the record evidence would compel a reasonable factfinder to reach a contrary determination." Jing Lin, 759 F.3d at 112 (quoting Kinisu, 721 F.3d at 34). Conclusions of law, meanwhile, are reviewed "de novo but with some deference to the agency's founded interpretation of statutes and regulations that it administers." McKenzie-Francisco v. Holder, 662 F.3d 584, 586 (1st Cir. 2011).

Davis first argues that his due process rights were violated. An immigration petitioner's right to due process entails, at its core, "the right to notice of the nature of the charges and a meaningful opportunity to be heard." Choeum v. INS, 129 F.3d 29, 38 (1st Cir. 1997). In other words, an alien is entitled to a fundamentally fair proceeding where the alien "must

have a meaningful opportunity to present evidence and be heard by an impartial judge." Muñoz-Monsalve v. Mukasey, 551 F.3d 1, 6 (1st Cir. 2008); see also 8 U.S.C. § 1229a(b)(4)(B). The right to present evidence is not unlimited, however, and "[a]n immigration judge, like other judicial officers, possesses broad (though not uncabined) discretion over the conduct of trial proceedings." Sharari v. Gonzáles, 407 F.3d 467, 476 (1st Cir. 2005) (quoting Aguilar-Solís v. INS, 168 F.3d 565, 568 (1st Cir. 1999)). This necessarily includes the admission or exclusion of evidence. Thus, to prove a violation of an alien's due process rights, the alien must show that the admission or exclusion was an abuse of the IJ's discretion and that the alien was prejudiced as a result. Id.

Here, we find no due process violation with the IJ's refusal to allow Davis's counsel to use the passport. After Davis's conflicting and inconsistent testimony, Davis's counsel sought to use the passport to refresh Davis's recollection. DHS objected and the IJ sustained the objection for two separate reasons.[5] We fail to see how either ruling was an abuse of discretion or how it meaningfully prevented Davis from presenting evidence to support his position since Davis did not seek to introduce the passport into evidence. See Muñoz-Monsalve, 551 F.3d

_____

[5] Notably, Davis's counsel never offered to show the passport to DHS to attempt to overcome the second objection.

-17-

at 6 (explaining that due process requires that an alien have "a meaningful opportunity to present evidence").

Moreover, the IJ's decision did not prejudice Davis. The IJ based its decision in part on the fact that Davis gave inconsistent testimony and was not able to recall key visits with Woodley -- dates that, in the IJ's view, should have been readily known by Davis if they actually occurred as he described. Thus, regardless of what dates Davis testified to after reviewing the passport, the IJ's view as to Davis's credibility would not likely have changed. The IJ's decision, therefore, did not deprive Davis of a fair trial. See Sharari, 407 F.3d at 476 (explaining that an alien must be prejudiced for the exclusion of evidence to be a due process violation).

Similarly, we reject Davis's argument that his due process rights were violated because the IJ admitted a letter from Woodley stating that the marriage was a fraud and two documents showing that Woodley twice attempted to withdraw the visa petitions even though they were unsworn and had not been previously submitted to the IJ and Davis. Davis never objected to the fact that they had not been previously submitted to the IJ or that he had not had a chance to review them, and thus any argument that this violated his due process rights is not properly before us. See Olujoke v. Gonzáles, 411 F.3d 16, 22-23 (1st Cir. 2005); Chan v. Ashcroft, 93 F. App'x 247, 252-53 (1st Cir. 2004); Mendes v. INS, 197 F.3d 6, 12

-18-

(1st Cir. 1999) ("This Court has long acknowledged that the doctrine of administrative exhaustion bars issues 'raised for the first time in a petition for review.'" (quoting Bernal-Vallejo v. INS, 195 F.3d 56, 64 (1st Cir. 1999))).

As for the fact that the letters were unsworn, and thus unauthenticated, the IJ did not abuse its discretion in admitting them. The Federal Rules of Evidence do not apply to immigration proceedings, so any authentication and hearsay requirements are less rigid. See Yongo v. INS, 355 F.3d 27, 30 (1st Cir. 2004); see also Sharari, 407 F.3d at 476 (finding that an immigration judge possesses broad discretion over trial proceedings, including the admission of evidence). While "[h]ighly unreliable hearsay might raise due process problems," id., there is nothing to suggest that that is the case here. Indeed, the IJ specifically noted that it would take into account the fact they were not notarized or authenticated when it decided how much "evidentiary weight" to give the document. This decision is consistent with the IJ's stated treatment of the unsworn and undated letters submitted by Davis in support of his petition, so we fail to see how this treatment was fundamentally unfair to Davis. Thus, there is no due process violation.

Having rejected Davis's due process allegations, we can turn to the real heart of his argument: that his waiver should have been granted because his marriage to Woodley was bona fide. His

challenge, however, essentially boils down to a disagreement with how the IJ and the BIA weighed the competing evidence, and we find ample support in the record to support the IJ and the BIA determinations that Davis's marriage to Woodley was not contracted in good faith.

Davis was the only witness to testify at the hearing, and though neither the IJ nor the BIA made a formal adverse credibility determination, there is substantial evidence to support the conclusion that there were "serious doubts" about Davis's credibility. For example, Davis was unable to accurately describe his and Woodley's visits to each other both before and after they were married. Davis testified that he and Woodley visited each other multiple times between when he first met her in Jamaica in August 2006 and when they were wed in April 2007, but he was unable to pinpoint when or where those trips took place. And though he did testify about a Thanksgiving trip prior to his marriage, this trip could not have occurred consistent with his testimony, since he also testified that he did not visit Woodley in the United States until the April 2007 trip when they wed.

Even more damning, however, is the fact that Davis was unable to explain to the IJ why he told the Consulate in November 2007 that he was single and visiting Nadine Woodley despite being married to Woodley for seven months at the time. See Chanthou Hem v. Mukasey, 514 F.3d 67, 69 (1st Cir. 2008) ("In evaluating the

agency's credibility determination, we consider whether the reasons given by the IJ are specific and cogent and based on omissions and discrepancies in the record that were not adequately explained by the alien.").

Given these inconsistencies, it is not surprising that the IJ and the BIA concluded that the lack of corroborating evidence cast further doubt on Davis's credibility -- especially since there were no other witnesses to testify about Davis and Woodley's relationship and such documentation should have been readily available to Davis. See Kheireddine v. Gonzáles, 427 F.3d 80, 88 (1st Cir. 2005) ("Nothing in Matter of S-M-J-[, 21 I. & N. Dec. 722 (BIA 1997),] precluded the IJ from deeming already not credible petitioners even less credible when they failed to back up their claims with information reasonably available."); Matter of Y-B-, 21 I. & N. Dec. 1136, 1139 (BIA 1998) ("[T]he weaker an alien's testimony, the greater the need for corroborative evidence."). For example, Davis testified that he spoke and emailed with Woodley every day prior to their marriage and that their communications increased after their marriage, yet he failed to provide any telephone or email records to the IJ. Similarly, Davis failed to provide any evidence of commingled accounts. Though Davis did provide copies of credit cards, debit cards, and health insurance cards issued in both his and Woodley's names, he submitted no bank statements or receipts to suggest that the cards were actually used

-21-

or that Davis and Woodley's finances were actually joined.  And while Davis claimed that he sought counseling due to his somewhat "severe" marital troubles, there is no evidence that he and Woodley actually met with a pastor; to the contrary, the evidence suggested that Davis and Woodley attended an interview with immigration services and described their relationship as "good."  All of this evidence (or lack thereof) is relevant to the bona fides of Davis's marriage, and the IJ and the BIA were correct to consider it.[6] Compare McKenzie-Francisco, 662 F.3d at 587 n.2 (noting that a

---

[6] Though Davis did provide additional documentation in his appeal before the BIA, the BIA refused to accept it, explaining that "the Board does not review evidence first presented on appeal," that Davis had "not shown that any of this evidence was not available at the time of his hearing," and that Davis failed to show that the "evidence is material to his application and will likely change the outcome of his case."  Davis does not challenge this ruling in his petition, and thus it is waived. Ouk v. Keisler, 505 F.3d 63, 66 n.3 (1st Cir. 2007) ("Because [petitioner] did not raise the issue in his opening brief . . . it is deemed waived.").  Still, we note that the BIA did not abuse its discretion in rejecting these additional documents. See Olujoke, 411 F.3d at 23 (explaining that a BIA decision to reopen proceedings and consider new evidence is discretionary).  None of the evidence Davis ultimately produced was unavailable at the time of Davis's initial hearing, and even if it were, it would not "compel a reasonable factfinder to make a contrary determination." Acevedo-Aguilar, 517 F.3d at 9 (quoting Stroni v. González, 454 F.3d 82, 87 (1st Cir. 2006)).  The newly provided checking account statements, for example, only show the last three months of the marriage and thus say nothing about the preceding seventeen months of marriage.  And while Davis ultimately provided a copy of his email inbox showing some communications between Davis and Woodley, the frequency of the communications is nowhere near the daily communication to which Davis testified. Moreover, the newly provided leasing documents show that both Davis and Woodley signed the lease, but there is no evidence that both of them actually lived there together.  Thus, even if these documents were considered, there still existed substantial evidence to conclude the marriage was not entered into in good faith.

joint membership card was "of little moment" since it could be procured by unrelated individuals), with Cho v. Gonzáles, 404 F.3d 96, 103 (1st Cir. 2005) (finding a bona fide marriage where petitioner "introduced evidence that, after the marriage, she and her husband jointly enrolled in a health insurance policy, filed tax returns, opened bank accounts, entered into automobile financing agreements, and secured a credit card" and also provided "extensive counseling records").

Davis's testimony was vague, at times inconsistent, and contained no corroboration through objective and easy-to-obtain documentation. Accordingly, after thoroughly reviewing the record, we "conscientiously find that the evidence supporting [the IJ and the BIA's] decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [IJ and the BIA's] view." Cho, 404 F.3d at 104 (quoting Mukamusoni v. Ashcroft, 390 F.3d 110, 119 (1st Cir. 2004)). We thus see nothing to compel a contrary determination. See Jing Lin, 759 F.3d at 112 (explaining that the court will only disturb the IJ's and the BIA's findings where "the record evidence would compel a reasonable factfinder to reach a contrary determination" (quoting Kinisu, 721 F.3d at 34)).

**B. The BIA's Denial of Davis's Motion to Remand**

Davis also challenges the BIA's decision denying his request to remand his case to the IJ due to his subsequent marriage to Bryan. Motions to remand are properly treated as motions to reopen, and, though generally disfavored, are reviewed for abuse of discretion. Falae v. Gonzáles, 411 F.3d 11, 14 (1st Cir. 2005). "At a bare minimum, the movant must make a showing of prima facie eligibility for the relief that he seeks." Id. Where, like here, the motion is premised on a marriage occurring during removal proceedings, the BIA has determined it will grant the motion only if:

> (1) the motion is timely filed;
>
> (2) the motion is not numerically barred by the regulations;
>
> (3) the motion is not barred by Matter of Shaar, 21 I. & N. Dec. 541 (BIA 1996), or on any other procedural grounds;
>
> (4) the motion presents clear and convincing evidence indicating a strong likelihood that the [applicant's] marriage is bona fide; and
>
> (5) [DHS] either does not oppose the motion or bases its opposition solely on Matter of Arthur, [20 I. & N. Dec. 475 (BIA 1992)].

Matter of Velarde-Pacheco, 23 I. & N. Dec. 253, 256 (BIA 2002), overruled in part by Matter of Avetisyan, 25 I. & N. Dec. 688 (BIA 2012) (overruling Matter of Velarde-Pacheco to the extent it held that a motion to reopen may be denied solely on DHS opposition).

-24-

Here, the BIA denied the motion to remand due to the fourth consideration -- the BIA's determination that there was a "lack of evidence of the bona fides of [Davis's] new marriage." We find no abuse of discretion with this decision. In support of his motion for remand, Davis provided an I-130 visa petition filed by Bryan, notices regarding the processing of that petition, Bryan's naturalization certificate, and numerous marriage- and divorce-related documents.

While these documents establish that Davis and Bryan are technically married, they do nothing to establish that the marriage was entered into in good faith. As with his petition before the IJ regarding his marriage to Woodley, there is no evidence of commingled assets, no evidence of cohabitation, no evidence of joint accounts, and no children born to the marriage. See 8 C.F.R. 204.2(a)(iii)(B) (explaining that the types of documents a petitioner may submit to establish that a marriage was entered into in good faith include documentation showing joint ownership of property; a lease showing joint tenancy of a common residence; documentation showing commingling of financial resources; birth certificates of children born to the petitioner and beneficiary; and affidavits of third parties having knowledge of the bona fides of the marital relationship). And while Bryan did submit an affidavit, the affidavit was self-serving and only described her intentions and beliefs regarding the marriage; it said nothing

-25-

about <u>Davis's</u> motivations for marrying Bryan, which are what matter in these proceedings. <u>Cf.</u> <u>Cho</u>, 404 F.3d at 102 ("The relevant legal standard is, again, whether [<u>petitioner</u>] intended to establish a life with her spouse at the time she married him." (emphasis added)); <u>Matter of Velarde-Pacheco</u>, 23 I. & N. Dec. at 256 (referring to an affidavit by Velarde-Pacheco himself).

In sum, Davis provided less evidence that his marriage to Bryan was in good faith than he did to support his failed petition before the IJ regarding his marriage to Woodley. Given that there was substantial evidence to support the BIA's conclusion that the marriage to Woodley was not entered into in good faith, we cannot say that the BIA abused its discretion in denying the motion to remand after concluding that there was not clear and convincing evidence that Davis's marriage to Bryan was in good faith.[7]

### III. <u>Conclusion</u>

After thoroughly reviewing the record, we are convinced that Davis was afforded a fundamentally fair proceeding during which substantial evidence was presented for the IJ and the BIA to

---

[7] In his brief, Davis also argues that the BIA erred when it noted that Davis failed to file the adjustment of status package because such a filing was not required. Whether the I-130 petition Davis filed was sufficient to satisfy 8 C.F.R. § 1003.2(c)'s requirement that a "motion to reopen proceedings for the purpose of submitting an application for relief must be accompanied by the appropriate application for relief and all supporting documentation" is a question we need not reach since the BIA's statement was made in a footnote and was clearly not the basis for its denial of Davis's motion to remand.

-26-

conclude that Davis's marriage to Woodley was not entered into in good faith. We likewise find no abuse of discretion in the BIA's decision to deny Davis's motion to reopen due to his subsequent marriage to Bryan.

**Petition Denied**.